UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHELLE KNICHEL,          )
                              )
        Plaintiff,          )
                              )
     vs.              )     Case No. 4:16-CV-534 (CEJ)
                              )
NANCY A. BERRYHILL[1], Acting   )
Commissioner of Social Security,   )
                              )
        Defendant.     )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On November 25, 2013, plaintiff Michelle Knichel protectively filed an application for supplemental security income with an alleged onset date of July 10, 2010. (Tr. 272–75).[2] After plaintiff's application was denied on initial consideration on December 31, 2013, (Tr. 149–52; 128–36), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 153).

Plaintiff and counsel appeared for a hearing on November 20, 2014 (Tr. 86–120, 169). The ALJ issued a decision denying plaintiff's application on January 9, 2015. (Tr. 63–70). The Appeals Council denied plaintiff's request for review on March 21, 2016. (Tr. 1–7). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.
[2] Plaintiff filed this application for supplemental security income pursuant to 42 U.S.C. §§ 1381-1385.

## A. Disability Application Documents

In a November 25, 2013, Disability Report,[3] (Tr. 276–85), plaintiff listed her medical conditions as (1) anxiety with panic attacks, (2) arthritis "throughout whole body," (3) left ankle with pins, screws, and plates, (4) a left knee that she could not walk on, (5) "nerve damage throughout body from car wreck," (6) "right shoulder messed up," (7) "right rib keeps popping out of place," and (8) depression. (Tr. 277). Plaintiff reported that in July 2010, these conditions became so severe that they prevented her from returning to work following her lay-off. (Tr. 277–78). Plaintiff reported that she had completed the eleventh grade and did not obtain a GED. She did not attend special education classes, and did not complete any type of specialized training, trade, or vocational school. *Id.* She listed her prior work experiences as a caregiver (2000–2001), housekeeper (2009–2010), and waitress (1999–2000). (Tr. 279). Plaintiff listed her medications as Buspirone for anxiety,[4] Diclofenac for advanced arthritis,[5] an indecipherable pain medication, and prenatal vitamins. (Tr. 280).

A November 25, 2013, Disability Field Report (Tr. 272–75) listed plaintiff's prior Social Security income application decision dates as August 12, 1999, March 31, 2006, September 9, 2009, and March 31, 2011. (Tr. 273). Social Security Administration official K. Braswell indicated that she did not observe plaintiff

---

[3] Plaintiff submitted disability reports with her prior denied applications in September 2009 and March 2011. (Tr. 219–41).

[4] Buspirone "is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety." https://medlineplus.gov/druginfo/meds/a688005.html (last visited June 8, 2017).

[5] Diclofenac capsules are used "to relieve mild to moderate pain," and diclofenac extended release tablets are "used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis . . .  and rheumatoid arthritis . . ." This medication can also be used to treat painful mentstrual periods. It is an NSAID. https://medlineplus.gov/druginfo/meds/a689002.html (last visited June 8, 2017).

experiencing difficulties in hearing, reading, breathing, understanding, coherency, concentrating, walking, or answering. (Tr. 274). She further described plaintiff as "friendly and easy to interview," "pleasant throughout the interview," and as having "clear speech." *Id.*

In an updated Disability Report, dated April 5, 2014, plaintiff reported that some changes in her condition had developed in January 2014. (Tr. 317–22). Plaintiff did not specifically identify the changes, but noted her recent doctors' visits and the reasons for them. Plaintiff saw Craig Ruble, M.D., on January 20, 2014 (among other unlisted dates) for a consultation, x-rays, surgery, and post-surgery check-up. (Tr. 318). She stated that she also had an appointment at Resolutions Behavioral Health on February 24, 2014, to treat her anxiety, depression, and bipolar disorder; she also sought to obtain prescription refills. (Tr. 318). She also had a blood test and x-rays on her left knee and ankle in 2013. (Tr. 319). Plaintiff listed her medications as Latuda for anxiety and depression,[6] Meloxicam for arthritis,[7] Norco for pain,[8] Ranitidine for acid reflux,[9] Risperidone for panic attacks and anxiety,[10] and Trazodone for insomnia.[11] *Id.* Plaintiff reported that she had anxiety and bipolar disorder and that her short- and long-term memory were "bad."

---

[6] Latuda (Lurasidone) treats the symptoms of schizophrenia, or may be used to treat depression in people with bipolar disorder. https://medlineplus.gov/druginfo/meds/a611016.html (last visited June 8, 2017).

[7] Meloxicam is used to "relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis . . . and rheumatoid arthritis." https://medlineplus.gov/druginfo/meds/a601242.html (last visited June 8, 2017).

[8] Norco is a colloquial term to refer to Hydrocodone – which is generally used for pain relief. https://medlineplus.gov/druginfo/meds/a601006.html (last visited June 8, 2017).

[9] Ranitidine treats ulcers, GERD, and other conditions where the stomach produces excess acid. https://medlineplus.gov/druginfo/meds/a601106.html (last visited June 8, 2017).

[10] Risperidone treats schizophrenia and episodes of mania in those with bipolar disorder. https://medlineplus.gov/druginfo/meds/a694015.html (last visited June 8, 2017).

[11] Trazadone is a serotonin modulator and is prescribed to treat depression. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last visited Sept. 18, 2015).

(Tr. 320). She noted that her hands and arms were "all messed up" and that her left leg and arthritis were in "bad shape." *Id.* Finally, plaintiff complained of migraine headaches. *Id.* Despite these problems, she stated that there had been no alterations in her daily activities since her last report. *Id.*

In a Function Report dated December 10, 2013, (Tr. 298–308), plaintiff stated that she lived in a house with her mother, son, and daughter. In response to a daily activities inquiry, plaintiff stated that she arose at around 7:00 a.m. and took her sixteen-year old son to school. Plaintiff noted that her son did not require much care, but she did his laundry and took him to school and to his sports activities. Plaintiff reported that taking care of her three-month old daughter took up most of her time. According to plaintiff, her daughter had been sick since birth and plaintiff had to "hold her a lot." (Tr. 298). Plaintiff also watched television or took a nap with her daughter. In the evening, plaintiff helped her mother with laundry and dishes. She explained that her mother took care of most of the household chores. Plaintiff went to bed around 9:30 or 10:00 p.m.

Plaintiff stated that since her automobile accident in 1999, she had experienced serious difficulties with her left leg and foot. *Id.* She added that she had problems with her left arm and right shoulder, and that she does not know how many surgeries she will require. Plaintiff also reported that she had broken her ribs, and that they would not "stay when Dr. Greenlee work[ed] on her." (Tr. 299). Additionally, plaintiff claimed that had been in "constant pain" since the onset of her disabling conditions. *Id.*

Plaintiff stated that she could generally tend to her personal care. She expressed no difficulties in dressing, bathing, shaving, feeding herself, or using the

toilet. *Id.* But, she explained that sometimes she needed assistance with her hair because her wrists would be "messed up." *Id.* She did not require any reminders to tend to her personal needs and grooming. (Tr. 300). But, she stated that she needed reminders from her mother to take her medications. *Id.*

Plaintiff could also prepare her own meals every day. *Id.* She cooked "complete meals" about three or four times each week, but otherwise made sandwiches or other "easy stuff." *Id.* Meal preparation took anywhere from ten to twenty minutes or, occasionally, as much as two hours. *Id.* Plaintiff noted that her left leg and foot were sometimes too swollen for prolonged standing. *Id.* Also, she stated that her left knee and ankle sometimes buckled and she would fall. *Id.* Plaintiff stated that she could do some household chores. She reported that she could accomplish a little at a time until her arms or left leg gave out. *Id.* Outdoor chores were not possible because plaintiff's body was "very arthritic"; she also noted her scoliosis and bulging discs. (Tr. 301).

Plaintiff reported that went outside every day. *Id.* She could drive a car, ride in a car, or use public transportation. *Id.* And she could do so alone. *Id.* Plaintiff went to the store about two times each week, for about thirty to forty-five minutes, to shop for food and necessities. *Id.* In addition, plaintiff went to doctors' appointments. (Tr. 302). Plaintiff did not need reminders to go places. *Id.* She stated that she would have severe panic attacks and anxiety around crowds. (Tr. 301, 304).

Plaintiff could also manage money in most respects. She could pay bills, count change, and use a checkbook or money orders. (Tr. 301). Plaintiff also had several hobbies and interests, including reading, watching television, resting, and

spending time with her children. (Tr. 302). She stated that she used to "do everything with [her] son," until 2010. *Id.* Since then, she said, "everything has progressively gotten worse." *Id.* She specifically mentioned her frequent falls. *Id.* Plaintiff also engaged in social activities, and spent time with others. *Id.* She talked to her family on the phone, or spent time with them at her house. *Id.* Plaintiff seldom used the computer, and if she did, it would only be for a few minutes. *Id.* Plaintiff stated that she sometimes had problems getting along with others, as she could not handle "all the people"; she would get nervous and her heart would race. (Tr. 303).

Plaintiff stated that her conditions inhibited her abilities to (1) lift more than ten pounds, (2) squat, (3) bend, (4) stand for more than ten to fifteen minutes, (5) reach, (6) walk for more than ten to fifteen minutes, (7) sit,[12] (8) kneel, and (9) climb stairs. *Id.* When walking, plaintiff required ten to fifteen minutes of rest, every ten to fifteen minutes. *Id.* She could only use her hands for a short time. *Id.* Plaintiff also expressed difficulties with her memory, concentration, completion of tasks, and handling of stress. (Tr. 303–04).

**B.    Testimony at Hearing**

Plaintiff testified that the medical conditions preventing her from maintaining employment included left ankle pain, nerve compression in her left leg, locking of her left knee, right shoulder pain and arthritis, double vision, migraine headaches, and anxiety. (Tr. 96–97).

Plaintiff testified that she received treatment for her ankle from Dr. Craig Ruble, an orthopedic surgeon. (Tr. 97). Dr. Ruble removed hardware from plaintiff's

---

[12] Plaintiff noted that she could sit for eight to ten hours each day. (Tr. 303).

ankle earlier in 2014, but she testified that her ankle "still hurts" and "still locks." *Id.* According to plaintiff, standing increased her pain though she still experienced left leg pain while sitting down. *Id.* She testified that she walked with a limp. *Id.* She could only stand for twenty minutes before her knee or ankle would lock and cause her to fall. (Tr. 98). And plaintiff could walk for about fifteen minutes before she would need to stop and rest to preventing locking. (Tr. 99).

Plaintiff also testified about her right shoulder pain. She stated that sitting for long periods caused intense shoulder pain. *Id.* Specifically, she could only sit for about fifteen to twenty minutes before she needed to stand. *Id.* She also had pain while extending or reaching her arm. (Tr. 100). Dr. Ruble performed a surgery on plaintiff's right shoulder in June 2014. (Tr. 111). She stated that during her follow-up visit, she reported continuing pain, and was told that the recovery process could take up to a year and another surgery could possibly be required. *Id.*

Plaintiff testified about her left leg injury. (Tr. 101). She specifically told the ALJ that she received a nerve decompression surgery on that leg. *Id.* She continued to experience tingling and numbness after the surgery. *Id.*

Plaintiff also described her left knee injury and condition. (Tr. 102). She stated that she shattered her knee in several places in a car accident. *Id.* After the accident, doctors implanted metal hardware in her knee. Plaintiff later required surgery on her knee to "remove a lot of the arthritis in it." *Id.* Plaintiff testified that because her knee locked, it would often give out and she would collapse. *Id.* This would occur if she walks for about twenty to thirty minutes without resting or sitting down. *Id.*

Plaintiff testified about her rheumatoid arthritis condition. Plaintiff testified that she could not use a computer or type due to her rheumatoid arthritis. (Tr. 100). She specifically stated that the condition caused hand cramping, and she could not grip. *Id.* Plaintiff had not seen a rheumatologist to diagnose the condition at the time of the hearing. (Tr. 112).[13] Furthermore, the medication she required for treatment of her hepatitis C inhibited her ability to take medication for her rheumatoid arthritis. *Id.*

**D.    Medical Records**

Plaintiff reported to Midwest Health Group, LLC, for an appointment with Gina Heberlie, N.P., on December 13, 2012. (Tr. 469). The notes indicate that plaintiff presented with "ganglion of tendon sheath," which began one year prior to this visit. *Id.* Notes further state that the pain was "of moderate intensity," and that plaintiff experienced symptoms several times daily. *Id.* Plaintiff stated that nothing relieved her symptoms. *Id.* Notes on plaintiff's musculoskeletal system state that plaintiff was "positive for myalgias," secondary to the metal in plaintiff's left knee. *Id.* Plaintiff also reported chronic pain since 2002, which affected her lower back. *Id.* A musculoskeletal exam showed a "normal gait," "decreased range of motion" in plaintiff's left knee flexion and extension, "pain with range of motion" in left shoulder adduction, and a two-centimeter "ganglion type nodule of the dorsal left wrist. (Tr. 471). Nurse Heberlie prescribed Flexeril to treat plaintiff's myalgia. (Tr. 472). She also referred plaintiff to a general surgeon regarding her ganglion of tendon sheath. *Id.* A visit on January 14, 2013, reported nearly identical notes on plaintiff's musculoskeletal system. (Tr. 464–66).

---

[13] Plaintiff also testified about her anxiety, migraines, and the symptoms of her hepatitis C.

On April 21, 2013, Craig R. Ruble, M.D., noted plaintiff's shoulder joint pain and impingement syndrome of the shoulder region. (Tr. 547).

Plaintiff presented to Washington County Memorial Hospital on October 2, 2013, for treatment of hepatitis C, among other issues. (Tr. 524–26). Angie DeClue, F.N.P., observed no edema or musculoskeletal abnormalities. (Tr. 525).

On October 18, 2013, plaintiff received an evaluation of her left knee and ankle from Daniel J. Martin, Jr., M.D. (Tr. 514). In his summary of plaintiff's history, he wrote that plaintiff had undergone open reduction internal fixation of "her left ankle several years ago with a severe trauma as well as an injury to her left knee," and that she "had the hardware removed from her left knee." *Id.* He then noted that "[r]adiographs of the left knee show a varus alignment," but she had "good maintenance of the joint space." *Id.* Dr. Martin explained that plaintiff's "ankle has advanced degenerative arthritis with post-traumatic changes." *Id.* His examination of plaintiff's left knee also showed a "varus alignment," intact neurocirculatory exam, stable collateral ligaments, and negative results on the Anterior Drawer and Lachman tests. *Id.* He observed crepitus with range of motion of the left ankle and well-healed surgical scars. *Id.* He ordered an MRI of plaintiff's left knee. *Id.*

Plaintiff visited Washington County Memorial Hospital complaining of shoulder pain, among other issues on November 15, 2013. (Tr. 520–23). Plaintiff told Shelley Lee, D.O., that she had experienced shoulder pain for some time. (Tr. 520). Plaintiff told Dr. Lee that heat and over-the-counter medications did not ease her pain. *Id.* No musculoskeletal abnormalities were noted after her physical exam. (Tr. 522).

Plaintiff presented to Washington County Memorial Hospital on November 25, 2013, complaining of worsening anxiety. (Tr. 516). She claimed that her right shoulder pain exacerbated her anxiety. *Id.* A review of plaintiff's musculoskeletal system showed right shoulder tenderness and mild pain with motion. (Tr. 517–18). The prescribed plan included an orthopedic evaluation. *Id.*

On November 26, 2013, plaintiff received a right shoulder x-ray at Washington County Memorial Hospital, pursuant to plaintiff's complaints of pain. (Tr. 528). Gaspar Fernandez, M.D., the reading physician, found that plaintiff had (1) an intact clavicle, (2) a normally aligned acromioclavicular joint, (3) no evidence of fracture, dislocation, focal osteolytic or osteoblastic lesions of the proximal humerus, (4) no hypertrophic or erosive changes, and (5) intact ribs. He concluded that no acute osseous abnormalities were identified and that "if internal derangement is suspected," an MRI could be conducted. *Id.*

On December 17, 2013, plaintiff visited Jefferson County Orthopaedic Surgery and Sports Medicine for left medial and lateral knee pain, as well as medial and lateral ankle pain. (Tr. 631). Plaintiff stated that she began experiencing "problems after she had fractured her knee and ankle after being involved in a motor vehicle crash back in 1999." *Id.* Plaintiff also reported surgeries on both her left knee and left ankle. *Id.* Plaintiff indicated several ongoing symptoms in her left knee, including a constant ache of the anteromedial and lateral knee, occasional swelling, popping, catching, locking, a sensation of instability, and some numbness over the lateral fibular region. *Id.* She added that walking and other activity aggravated her pain, while sitting alleviated her pain. *Id.* Dr. Craig Ruble conducted a detailed physical exam, which showed well-healed incisions in plaintiff's knee,

with no obvious swelling, erythema, or heat. (Tr. 632). Further, Dr. Ruble noted that she "demonstrated 0 degrees of extension and 125 degrees of flexion with obvious crepitus palpated." *Id.* Her ligaments were stable and she had a positive Tinel sign at the left common peroneal nerve at the fibular neck. *Id.* She showed no calf tenderness.

Dr. Ruble also examined plaintiff's ankle. He noted well-healed scars and mild soft tissue swelling, with tenderness to palpation over the medial ankle. *Id.* "She had slightly decreased flexion and decreased rotation of the left ankle." *Id.* He described plaintiff's right lower extremity as "within normal limits," "unremarkable," and "neurovascularly intact." *Id.* A diagnostic study of plaintiff's ankle showed "plates and screws laterally with a sutured anchor in the medial ankle". (Tr. 632, 634). Imaging also revealed bone-on-bone degenerative joint disease. *Id.* Images of plaintiff's left knee showed "previous fractured lateral tibial plateau" with removed hardware. *Id.*

Dr. Ruble concluded that plaintiff had ankle pain arising from post-traumatic degenerative joint disease, painful orthopedic hardware in the left ankle, and knee pain from "questionable medial and lateral meniscus tearing and probable compressed common peroneal nerve [in the] left knee." *Id.* Dr. Ruble recommended several treatments including (1) icing and elevating the knee and ankle frequently, (2) taking a Mobic[14] prescription with intermittent doses of Tylenol, (3) stopping smoking, (4) beginning a home exercise program for the knee

_____

[14] Mobic (Meloxicam) is used to "relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints." https://medlineplus.gov/druginfo/meds/a601242.html (last visited June 9, 2017).

and ankle, (5) taking cortisone injections for the knee and ankle, and (6) removing the hardware in the left ankle. *Id.*

On January 7, 2014, plaintiff underwent surgery to remove hardware from her left ankle. (Tr. 640). The post-operative diagnosis indicated that had significant degenerative joint disease in her left ankle. *Id.*

Plaintiff reported to Washington County Memorial Hospital on January 9, 2014, with a migraine headache. (Tr. 586). Her listed chronic conditions included pain in the thoracic spine, osteoarthritis (generalized, involving multiple sites), rheumatoid arthritis, and migraines. *Id.*

On January 20, 2014, plaintiff visited Jefferson County Orthopaedic Surgery and Sports Medicine for a follow-up evaluation of her left-ankle hardware removal. (Tr. 629). Notes represent that plaintiff was "doing well" and "denie[d] any problems." *Id.* But, plaintiff did say she had "some pain proximal at the lower extremity with numbness and tingling." *Id.* A physical exam of plaintiff's left ankle showed good range of motion in all directions with good strength and stability. *Id.* Dr. Ruble met with plaintiff and recommended that she ice and elevate her ankle frequently, increase activity as tolerated, bear weight as tolerated, and wear her boot as needed. *Id.* They also discussed the risks and benefits of a left knee arthroscopy with decompression of the common peroneal nerve at the fibular neck. *Id.* A re-evaluation was scheduled a month after this visit. *Id.*

That same day plaintiff had an appointment at Mineral Area Family Surgery. (Tr. 678–83). William C. Sippo, M.D., consulted plaintiff regarding her shoulder pain. (Tr. 678). Her shoulder injury purportedly occurred two years prior when plaintiff fell and landed on her outstretched arm. *Id.* She stated in particular that

since that incident, she experienced pain medial to the right scapula. *Id.* Records further explain that plaintiff received no prior shoulder or bone imaging studies. *Id.* In an examination of plaintiff's musculoskeletal system, Dr. Sippo noted tenderness on palpation in the medial to right scapula. (Tr. 681). Dr. Sippo opined that the scapula pain could be related to a compression fracture of the spine; he also considered that plaintiff might have a rib injury. *Id.* He found no other abnormalities. *Id.* A summary of plaintiff's conditions included pain in the thoracic spine, chest wall pain, chronic hepatitis C, bipolar disorder, panic disorder without agoraphobia, tobacco dependence syndrome, gastroesophageal reflux disease, lower back pain, and chronic pain syndrome. (Tr. 682).

On January 24, 2014, plaintiff underwent left knee arthroscopic surgery, which involved a partial lateral meniscectomy, chondroplasty of the medical femoral condyle, and debridement of hypertrophic synovium with an excision of pathologic superomedial plica. (Tr. 637). Dr. Ruble also conducted an open decompression of the left leg common peroneal nerve at the fibular neck. *Id.* Dr. Ruble performed the surgery to provide relief for plaintiff's left knee pain, which spread down the lateral aspect of her left leg to her foot, and led to burning, numbness, and tingling sensations. *Id.* Those sensations had "been going on for several months." *Id.*

Plaintiff reported a history of osteoarthritis and rheumatoid arthritis during visits concerning her mental health on December 30, 2013, January 27, 2014, and April 14, 2014. (Tr. 601–03, 604–06, 607–10).

On February 6, 2014, plaintiff reported to a post-operative visit at Jefferson County Orthopaedic Surgery and Sports Medicine. (Tr. 627). Plaintiff's evaluation after her left knee arthroscopy showed soreness, numbness, and tingling. *Id.* Her

swelling had improved and she could bear weight on the knee. *Id.* Dr. Ruble ordered a prescription for Meloxicam and recommended frequent elevation. *Id.*

On March 3, 2014, plaintiff visited the Great Mines Health Center complaining of ankle pain, lower leg pain, anxiety, and vision problems. (Tr. 538). In relevant part, plaintiff stated that she experienced "dull," ongoing pain in her left ankle, where a metal plate was removed. *Id.* Moreover, plaintiff related lower leg pain. *Id.* She said her leg pain was constant and ongoing. *Id.* Her diagnoses included leg pain and arthritis, among others. *Id.*

Plaintiff reported to Great Mines Health on March 13, 2014, to discuss several health issues and establish care. (Tr. 642–47). Specifically, plaintiff complained of anxiety, ankle and lower leg pain, vision change, and hepatitis C. (Tr. 642). An examination of plaintiff's musculoskeletal system showed multiple surgical scars on her upper and lower leg, as well as ankle distortion and swelling. (Tr. 644). She demonstrated normal gait and station. *Id.* Plaintiff had no clubbing or edema in her extremities. *Id.* Nona Mungle, N.P., diagnosed plaintiff with bipolar disorder, anxiety, hepatitis C, leg pain, arthritis, insomnia, and acute sinusitis. (Tr. 644–45). Plaintiff received Meloxicam and Hydrocodone prescriptions for her leg pain. (Tr. 645).

Plaintiff received an evaluation for treatment of hepatitis C on April 16, 2014. (Tr. 542–44). During that visit, plaintiff told Paul Garvin, M.D., that she suffered from chronic pain syndrome "due to her left ankle post surgical pain and arthritic condition." (Tr. 542). Dr. Garvin observed that plaintiff moved all her extremities well, and that she had no edema, clubbing, or cyanosis. (Tr. 543).

On April 18, 2014, plaintiff visited Great Mines Health Center, to discuss discontinuing Vicodin because it was not compatible with the treatment plaintiff was receiving for hepatitis C treatment. (Tr. 648). She requested Ultram and a muscle relaxer as replacements. *Id.* With regard to her musculoskeletal system, plaintiff complained in particular about leg pain, hip pain, and knee pain. *Id.* She denied muscle spasms. *Id.* Overall, plaintiff's gait and station appeared normal. (Tr. 650). Edwardo Verzola, M.D., diagnosed limb pain, arthropathy not otherwise specified,[15] hepatitis C, and allergic rhinitis. *Id.* Edwardo Verzola, M.D. prescribed Flonase for allergies, Tramadol and Robaxin for pain,[16] a return visit in three months, and adding one hour of aerobic exercise each day. *Id.*

Plaintiff presented with right shoulder pain to Jefferson County Orthopaedic Surgery and Sports Medicine on April 21, 2014. (Tr. 624). She noted that she had experienced the pain for the last two years, and that the pain worsened with sitting; she rated the pain as a seven out of ten, on average. *Id.* Her medication list included Trazodone, Robaxin, Tramadol, Zantac, and Seroquel. *Id.* Examination of plaintiff revealed full range of motion and good strength and ability. (Tr. 625). Dr. Ruble noted a positive impingement test. He also stated that plaintiff was "tender to palpation across the medial scapular border." *Id.* Her upper and bilateral lower extremity exams were unremarkable. *Id.* Diagnostic scanning of plaintiff's right shoulder showed no fracture, dislocation, or significant changes, but did reveal a small spur. (Tr. 625–26). Dr. Ruble recommended icing and frequent elevation, a

---

[15] Arthropathy is a generic label for "any joint disease." Taber's Cyclopedic Medical Dictionary 125 (14th ed. 1981).

[16] Robaxin (Methocarbamol) "is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." https://medlineplus.gov/druginfo/meds/a682579.html (last visited June 9, 2017).

daily at-home exercise program, Mobic as an anti-inflammatory, and physical therapy. (Tr. 625). He also gave plaintiff a steroid injection. *Id.*

On May 19, 2014, plaintiff visited Jefferson County Orthopaedic Surgery and Sports Medicine regarding her shoulder pain, incurred with "any motion." (Tr. 622). She rated her pain as an eight out of ten on average. *Id.* She stated that she did not attend physical therapy because her insurance did not cover it. *Id.* Craig Ruble, M.D., conducted a physical exam of plaintiff's right shoulder and found that she had "full abduction and forward elevation with pain," tenderness to palpation over the scapular border, and "minimal" tenderness over the AC joint. *Id.* He found unremarkable results upon assessing plaintiff's left shoulder. *Id.* Plaintiff scheduled her surgery during this visit. (Tr. 623).

Plaintiff visited Great Mines Health Center on June 5, 2014, complaining of hepatitis C, depression, headache, arthralgia, ankle pain, lower leg pain, and anxiety. (Tr. 653). Plaintiff noted that she experienced pain throughout her body due to a car accident in 1999. *Id.* The pain associated with those injuries was purportedly diffuse, ongoing, aching, and chronic. *Id.* An exam of plaintiff's system indicated multiple surgical scars of the upper and lower leg, ankle distortion and swelling, and normal gait and station. (Tr. 655). Her medications at that time were Robaxin, Flonase, Trazodone, Seroquel, Amoxicillin, Zantac, Ibuprofen, and Hydrocodone. (Tr. 653).

Dr. Ruble performed plaintiff's arthroscopic shoulder surgery on June 27, 2014. (Tr. 593–96). Notes indicate that the procedure was intended to decompress the subacrominal space with a partial acromioplasty. (Tr. 593). Dr. Ruble's report states that plaintiff had "significant pain in her right shoulder . . . for some time,"

and had previously "undergone extensive conservative treatment." *Id.* Plaintiff attended a follow-up appointment on July 10, 2014, after her shoulder surgery. (Tr. 620). Kasey Schmitt, P.A., noted that plaintiff's pain persisted, but that her right shoulder seemed "to be healing well" and that she had "good range of motion in all directions," as well as "good strength and stability." *Id.* Nurse Schmitt recommended that plaintiff ice frequently and work on a daily exercise program. (Tr. 621).

On July 25, 2014, plaintiff presented at Washington County Memorial Hospital for an individual therapy session. (Tr. 598). During that visit, plaintiff related that she suffered from osteoarthritis involving multiple sites, as well as rheumatoid arthritis. *Id.*

Plaintiff visited Washington County Memorial Hospital on August 3, 2014, for extremity swelling or pain. (Tr. 694). David Mullen, D.O., ordered a rheumatoid screening, and formulated an impression of rheumatoid arthritis. (Tr. 701, 703). Dr. Mullen prescribed Celebrex, Hydroxychloroquine, and Prednisone. (Tr. 703). Dr. Mullen recommended a long-term follow-up with a rheumatologist. *Id.*

On August 4, 2014, plaintiff received an exam from Bruce R. Bacon, M.D., regarding hepatitis C treatment. (Tr. 550–55). During the course of that visit, plaintiff told Dr. Bacon about her medical history. She reported "severe musculoskeletal problems related to her left ankle and also to her arthritic conditions." (Tr. 555).

Plaintiff visited Great Mines Health Center on August 5, 2014, for polyarticular joint pain[17]. (Tr. 658). Notes indicate that she previously received a diagnosis for rheumatoid arthritis. *Id.* Plaintiff described her joint pain as diffusely located, chronic, and increasing in frequency. *Id.* It purportedly moderately limited her activities. *Id.* Diagnoses included rheumatoid arthritis, hepatitis C, and tobacco use disorder. (Tr. 659). John S. Pearson, D.O., prescribed that plaintiff stop use of hydrocodone, cease use of further steroids or Plaquanil until her hepatitis C therapy completed, and start Oxycodone. (Tr. 660). He also recommended a follow-up appointment. *Id.*

Plaintiff returned to Great Mines Health Center on August 27, 2014. (Tr. 663–67). She presented with chronic, diffuse joint pain, which started about one month prior to her appointment. (Tr. 663). Plaintiff stated that her frequency of episodes declined with use of Oxycotin and Celebrex. *Id.* Further, her symptoms moderately limited her activities. *Id.* Notes again indicate that plaintiff received a diagnosis of rheumatoid arthritis in an earlier emergency room visit. *Id.* Plaintiff specifically complained about hand pain, leg pain, stiffness, and arthralgia(s). (Tr. 664). An examination of plaintiff's musculoskeletal system showed heberdens's node on her digits, no erythema, and bouchard's node. (Tr. 665). Further, a normal gait and station were observed. *Id.* Nurse Mungle diagnosed hepatitis C and rheumatoid arthritis. *Id.* Nurse Mungle prescribed a return visit in a month and a refill of Celebrex and Oxycodone. *Id.* She referred plaintiff to rheumatology after completion of her hepatitis C treatment. *Id.*

---

[17] Polyarticular means "affecting many joints." <u>Taber's Cyclopedic Medical Dictionary</u> 1131 (14th ed. 1981).

Plaintiff again reported to Great Mines Health Center on September 26, 2014, for her joint pain and a renewal of her Oxycodone prescription. (Tr. 668). Plaintiff again noted hand pain, leg pain, stiffness, swelling, and arthraliga. (Tr. 668–69). Observations regarding her musculoskeletal system remained the same. (Tr. 670). Her diagnoses included rheumatoid arthritis, constipation, tobacco use disorder, hepatitis C, and allergic rhinitis. *Id.*

Plaintiff presented at Great Mines Healthcare on November 6, 2014, regarding several concerns, including joint complaints. (Tr. 766–71). Records indicate that plaintiff needed refills of Oxycodone and Seroquel. (Tr. 766). Records also demonstrate that plaintiff began treatment in November 2014, which would continue for three months. *Id.* Her treatment for rheumatoid arthritis would be limited "until treatment for Hepatitis C [was] completed." *Id.* Additionally, plaintiff's joint pain was purportedly diffuse, as well as ongoing at that time. Her condition "moderately limit[ed] activities with Oxycotin and Celebrex," and the frequency of her episodes was decreasing. *Id.* A review of plaintiff's musculoskeletal system states that, "plaintiff complained of hand pain, leg pain, stiffness, swelling and arthralgia(s)." (Tr. 767). An examination of her digits and nails, showed Heberden's node and Bouchard's node, but no erythema. (Tr. 768). She demonstrated a normal gait and station. *Id.* Her diagnoses included pain in her limbs and rheumatoid arthritis. *Id.*

On December 9, 2014, plaintiff visited Christopher Sloan, DPM, a podiatrist, regarding the arthrodesis of her left ankle, and consultation regarding a possible total joint arthroplasty procedure. (Tr. 762).

### III.  **The ALJ's Decision**

On January 9, 2015, the ALJ issued a decision containing the following findings with respect to plaintiff's application for disability benefits pursuant to Social Security Act § 1614(a)(3)(A):

1.  Plaintiff did not engage in substantial gainful activity since November 21, 2013, the application date. 20 C.F.R. § 416.971, *et seq.*

2.  Plaintiff had the following severe impairments: left ankle fracture with degenerative arthritis, hepatitis C, and right shoulder impingement syndrome. 20 C.F.R. § 416.920(c).

3.  Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 416.920(d), 416.925, 416.926.

4.  Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a), except no foot controls with left lower extremity and only occasional overhead work with right upper extremity.

5.  Plaintiff has no past relevant work. 20 C.F.R. § 416.965.

6.  Plaintiff was born on August 27, 1980, and was 33 years old, which is defined as a younger individual age 18-44 on the date the application was filed. 20 C.F.R. § 416.963.

7.  The plaintiff had a limited education and could communicate in English. 20 C.F.R. § 416.964.

8.  Transferability of job skills was not an issue because plaintiff did not have past relevant work. 20 C.F.R. § 416.968.

9.  Considering the plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could perform. 20 C.F.R. § 416.969.

10. Plaintiff was not under a disability, as defined in the Social Security act, since November 21, 2013, the date the application was filed. 20 C.F.R. § 416.920(g).

(Tr. 63–70).

# IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997). "'Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (*quoting Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).The Commissioner has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at

942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.*

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." *Moore*, 572 F.3d at 523 (quotation and citation omitted).

At step four, the ALJ determines whether a claimant can return to her past relevant work, by comparing the RFC with the physical and mental demands of a claimant's past work. 20 C.F.R. § 404.1520(f). The burden at step four remains with the claimant to prove her RFC and establish that he cannot return to her past relevant work. *Moore*, 572 F.3d at 523; *accord Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); s*ee*

*also* 20 C.F.R. § 404.1520(f). If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.  Discussion

Plaintiff claims that the ALJ erred in (1) determining that plaintiff's arthritis did not constitute a severe impairment, (2) formulating plaintiff's RFC due to improper consideration of plaintiff's arthritis, depression as an indicator of disabling pain, and credibility, and (3) establishing that plaintiff could perform a significant number of jobs in the national economy, attendant to flawed hypotheticals to the vocational expert. She also claims that the Appeals Council erred in failing to consider her newly submitted evidence. Because the Court finds that the ALJ erred in failing to consider all relevant medical evidence of plaintiff's rheumatoid arthritis, and remand is merited, the Court will not address the remainder of plaintiff's arguments.

## B.  Step 2: Severe Impairment Analysis

A severe impairment is an impairment or combination of impairments that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Conversely, an impairment is not severe if it is "a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3P, 1996 WL 374181 (1996).

Regulations define "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521. Examples of such abilities include, "(1) [p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) [c]apacities for seeing, hearing, and

speaking; (3) [u]nderstanding, carrying out, and remembering simple instructions, (4) [u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers and usual work situations; and (6) [d]ealing with changes in a routine work setting." § 404.1521(b).

The impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statements of symptoms." 20 C.F.R. § 404.1508.

"It is the claimant's burden to establish that his impairment or combination of impairments are severe." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, *see Hudson v. Bowen*, 870 F.2d 1392, 1395 (8th Cir. 1989), but it is also not a toothless standard. . ." *Id.* at 708. Here, the ALJ found that plaintiff's left ankle fracture with degenerative arthritis, hepatitis C, and right shoulder impingement syndrome constituted severe impairments pursuant to 20 C.F.R. § 404.1520(c). He determined that the claims of arthritis and nerve damage *throughout plaintiff's body*, and the mental impairments of anxiety and depression did not constitute severe impairments.

### Arthritis Determination

Plaintiff contends that the ALJ failed to "articulate a legally sufficient rationale relative to the severity of plaintiff's arthritic condition." [Doc. #13 at 6]. She adds that the ALJ's determination is "called into significant question by evidence of record." *Id.* To support this assertion, plaintiff submits Dr. Craig Ruble's medical

assessment from December 2013, Dr. Daniel Martin's letter from October 2013, Dr. David Mullen's August 2014 reactive arthritis record, an August 2014 emergency room diagnosis of rheumatoid arthritis by Dr. David Mullen, and new evidence from rheumatologist Dr. Francisco Garriga (from February 2016). *Id.* at 6–7.

As a preliminary matter, it is critical to distinguish the ALJ's separate arthritis findings. The ALJ found that plaintiff *did* in fact have the severe impairment of degenerative arthritis (osteoarthritis) in her ankle. (Tr. 65). But, he concluded that plaintiff did not have a medically determinable abnormality of arthritis throughout her body (rheumatoid arthritis) that significantly limited her ability to perform work-related activities for twelve months or longer.[18] *Id.* Specifically, the ALJ reasoned that "[a]lthough maybe one examiner noted the claimant might have arthritis, examinations failed to reveal consistent signs indicative of an abnormality that would cause her pain throughout her body. Particularly notable are those examinations that failed to reveal[stet] signs of either whole-body arthritis or a neurological disorder." *Id.* The ALJ also stated: "most examinations revealed she had intact sensation . . . and no edema. During one examination it was noted she had normal overview of her musculoskeletal system." *Id.* The ALJ concluded his analysis by adding that there was only one occurrence in the record where plaintiff received treatment for edema. *Id.*

---

[18] Rheumatoid arthritis is "an inflammatory disease that causes pain, swelling, stiffness, and loss of function in the joints. It occurs when the immune system . . . turns its attack against the membrane lining the joints. Rheumatoid arthritis has several features that make it different from other kinds of arthritis. For example, rheumatoid arthritis generally occurs in a symmetrical pattern, meaning that if one knee or hand is involved, the other one is also." https://www.niams.nih.gov/health_Info/Rheumatic_Disease/default.asp (last visited June 8, 2017). On the other hand, degenerative arthritis or osteoarthritis, "is the most common form of arthritis," which is "sometimes called degenerative joint disease or "wear and tear" arthritis." https://www.cdc.gov/arthritis/basics/osteoarthritis.htm (last visited June 8, 2017). It occurs when "the cartilage and bones within a joint begin to break down." *Id.*

Several of the records that plaintiff cites pertain to degeneration or osteoarthritis in plaintiff's ankle. But, the ALJ *did* in fact find that the ankle injury with degenerative arthritis was a severe condition.[19] Accordingly, those records do not undermine the ALJ's finding that plaintiff did not have an impairment of arthritis throughout her body. However, plaintiff also cites several records, which indicate definitive diagnoses for rheumatoid arthritis. Defendant acknowledges the existence of records mentioning plaintiff's history of rheumatoid arthritis. But, defendant argues that those notations "were primarily contained in mental treatment records or referred to a history of rheumatoid arthritis, suggesting that such references were based largely on subjective complaints rather than objective evidence." [Doc. #18 at 5]. The Court disagrees.

First, plaintiff received a diagnosis of rheumatoid arthritis from the emergency department of Washington County Memorial Hospital on August 3, 2014. (Tr. 694–703). She presented to the hospital complaining of "extreme swelling or pain." (Tr. 694). The preliminary nursing examination revealed "the right and left lower leg had 3 plus edema." (Tr. 696). Next, records indicate that plaintiff received a "rheumatoid FCT Screen." (Tr. 697). That rheumatoid factor screen was interpreted as abnormal. (Tr. 701). David Mullen, D.O., accordingly issued an impression of rheumatoid arthritis. (Tr. 703). Dr. Mullen also wrote a prescription for hydroxychloroquine[20], 200 mg, to take twice daily for "pain and

---

[19] Plaintiff cites to an x-ray interpretation that states that there was bone-on-bone DJD" in plaintiff's ankle. [Doc. #13 at 6 (citing Tr. 634)]. Plaintiff also points to plaintiff's left ankle surgery in January 2014, and to the opinion of Dr. Martin from October 2013. [Doc. #13 at 6 (citing Tr. 640, 573, 514)]. All of these records serve to *confirm* the ALJ's finding of the severe condition of degenerative arthritis in plaintiff's ankle.

[20] Hydroxychloroquine is used to treat acute attacks of malaria, as well as discoid or systemic lupus erythematosus and rheumatoid arthritis. https://medlineplus.gov/druginfo/meds/a601240.html (last visited June 8, 2017).

swelling."[21] (Tr. 698). Her disposition also included a "follow up with [a] rheumatologist." *Id.* Emergency room personnel forwarded plaintiff's follow-up instructions to her healthcare provider, Nona Mungle. (Tr. 703). Although the ALJ described the finding of edema in this August 2014 record, he failed to acknowledge the rheumatoid arthritis diagnosis from the blood test on that date.

Second, subsequent records confirm the issuance of this diagnosis. In particular, plaintiff's rheumatoid arthritis diagnosis appears in records from visits to Great Mines Health Center on August 5, 2014, August 27, 2014, September 26, 2014, and November 6, 2014 (Tr. 658–60; 663–67; 668–72, 766–71), and in records of consultation with Dr. Bruce R. Bacon regarding her hepatitis C treatment on August 4, 2014 (Tr. 550–55). Those subsequent records also indicate symptoms of chronic, diffuse, joint pain or polyarticular joint pain, as well as Bouchard's nodes and Heberden's nodes. The ALJ failed to acknowledge all of these subsequent medical records that refer to the diagnosis of rheumatoid arthritis.

Third, although the record reflects a relative dearth of records pertaining to plaintiff's rheumatoid arthritis, several documents also acknowledge that plaintiff was compelled to delay treatment in light of her hepatitis C treatment plan. (Tr. 766–71; 663–67; 660). Plaintiff also confirmed this fact in her testimony. (Tr. 107). Consideration of this August 2014 record is also critical in light of plaintiff's diffuse joint pain and considerable pain medication prescriptions throughout the record.

Fourth, the ALJ's failure to address these records becomes even more material in light of plaintiff's new evidence - a diagnosis of rheumatoid arthritis from rheumatologist Francisco Garriga, M.D. (Tr. 54).

_____

[21] Upon reporting to the hospital plaintiff only held prescriptions for Hydrocodone, Klonopin, Mobic, Seroquel, Trazodone, and Zantac.

In sum, although plaintiff's evidence of a rheumatoid arthritis diagnosis "went uncontradicted," the ALJ did not incorporate this clinical evidence into his analysis or hypotheticals. *See Snead v. Barnhart*, 360 F.3d 834, 837–39 (8th Cir. 2004) (reasoning that an ALJ failed to fully develop the record in light of his failure to consider plaintiff's heart condition); *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (reasoning that although deficiencies in opinion-writing without practical effect do not provide a sufficient basis to set aside an ALJ's finding, an incomplete analysis can serve as a basis for remand). As a result of the ALJ's failure to consider all relevant medical evidence, the determination that plaintiff retains the RFC to perform sedentary work, without foot controls with the lower left extremity and with only occasional overhead work with the right upper extremity, is not supported by substantial evidence in the record as a whole.

**\*\*\*\***

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 13th day of June, 2017.